## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 09 B 39937 |
| | ) | Chapter 11 |
| EQUIPMENT ACQUISITION | ) | Judge Donald R. Cassling |
| RESOURCES, INC. | ) | |
| | ) | |
| Debtor. | ) | |
| ———————————————— | ) | |
| WILLIAM A. BRANDT, JR., not | ) | |
| individually but solely in his capacity as | ) | |
| Plan Administrator for EQUIPMENT | ) | |
| ACQUISITION RESOURCES, INC. | ) | |
| | ) | |
| Plaintiff, | ) | Adversary No. 11 A 02147 |
| | ) | |
| v. | ) | |
| | ) | |
| ROHR-ALPHA, INC. f/d/b/a | ) | |
| ARLINGTON CHRYSLER JEEP | ) | |
| DODGE IN BUFFALO GROVE, | ) | |
| | ) | |
| Defendant. | ) | |

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

William A. Brandt, Jr. (the "Plaintiff") is the Plan Administrator for the debtor, Equipment Acquisition Resources, Inc., ("EAR"). He filed this suit to recover alleged fraudulent conveyances made by EAR to a car dealer, Rohr-Alpha, Inc. f/d/b/a Arlington Chrysler Jeep Dodge in Buffalo Grove ("Rohr-Alpha"), for the purchase of two Jeep vehicles. Count I of the complaint seeks the avoidance and recovery of one transfer that was made within two years of the bankruptcy filing under 11 U.S.C. § 548(a)(1)(B). Under § 5 of the Illinois Uniform Fraudulent Transfer Act (the "UFTA"), 740 Ill. Comp. Stat. 160/5(a)(2), made applicable by 11 U.S.C. § 544(b)(1), Count II of the complaint seeks the avoidance and recovery of the Count I

transfer as well as three additional transfers that were made within four years of the bankruptcy filing.

The Plaintiff asserts that the payments are avoidable as constructively fraudulent transfers because EAR never took possession or had the use of the vehicles purchased with its funds and the payments were made during a period when EAR was insolvent. At a two-day trial during which Rohr-Alpha elected to present no witnesses, three material issues were in dispute: (1) whether EAR was insolvent when the payments were made; (2) whether the payments were made with EAR's funds; and (3) whether EAR received reasonably equivalent value in exchange for the payments.

For the reasons that follow, as to Count I, the Court finds that the Plaintiff failed to prove that EAR did not receive reasonably equivalent value for the transfer of its funds that were used to purchase the 2006 Jeep. The Court therefore concludes that the Plaintiff has failed to meet his burden of proving that EAR's payment for the 2006 Jeep vehicle was constructively fraudulent.

As to Count II, the Court finds that with respect to the 2007 Jeep, the Plaintiff established that EAR did not receive reasonably equivalent value for the funds used to purchase that vehicle. The Court also finds that the Plaintiff established that EAR was insolvent during the four years preceding its bankruptcy filing, and that payments for the 2007 Jeep were made with EAR's funds. The Court therefore finds that the Plaintiff established that the transfers for the 2007 Jeep were constructively fraudulent and can be avoided and recovered.

## I. JURISDICTION AND PROCEDURE

Because this is a fraudulent conveyance action, the Court will proceed as though it is a noncore matter within the meaning of 28 U.S.C. § 157(c)(1). *See Exec. Benefits Ins. Agency v. Arkison*, 134 S.Ct. 2165, 2173 (2014). Accordingly, the Court will enter proposed findings of

fact and conclusions of law. To the extent a conclusion of law is improperly characterized as a finding of fact, it should be considered a conclusion of law. To the extent a finding of fact is improperly characterized as a conclusion of law, it should be considered a finding of fact. *See In re Piper's Alley Co.*, 69 B.R. 382, 384 (N.D. Ill. 1987).

## II. APPLICABLE LEGAL STANDARDS

In order to sustain a claim that a pre-petition payment is avoidable as constructively fraudulent under § 548(a)(1)(B), a movant must prove, by a preponderance of the evidence, the following elements: (1) that the debtor transferred its property or interest therein; (2) that it did so within the two years preceding the filing of the bankruptcy petition; (3) that the debtor received less than a reasonably equivalent value in exchange for the transfer; and (4) that the debtor was insolvent when the transfer was made or was rendered insolvent thereby. *White v. Coyne, Schultz, Becker & Bauer*, S.C. *(In re Pawlak)*, 483 B.R. 169, 182 (Bankr. W.D. Wis. 2012); *Grochocinski v. Schlossberg, (In re Eckert)*, 388 B.R. 813, 831 (Bankr. N.D. Ill. 2008), *aff'd*, 402 B.R. 825 (N.D. Ill. 2009).

Section 544(b)(1) of the Bankruptcy Code expressly authorizes the avoidance of a transfer voidable under applicable state law. 11 U.S.C. § 544(b)(1); *Schlossberg*, 388 B.R. at 838. Here, the applicable state law asserted by the Plaintiff under § 544(b)(1) is the UFTA. Section 5 of the UFTA has virtually the same elements as § 548(a)(1), except that the former has a four-year, rather than a two-year, look-back period. *Compare* 740 Ill. Comp. Stat. 160/10 *with* § 548(a)(1).

The parties agree that within the four years preceding the filing of EAR's bankruptcy petition there were four payments made for the purchase of two vehicles. However, Rohr-Alpha disputes the remaining elements: that EAR was insolvent when the transfers were made; that the

3

transfers were of EAR's property; and that EAR did not receive reasonably equivalent value in exchange for its payments.

## III. DISCUSSION

### A. The Insolvency Element

#### 1. Legal Standards Regarding Insolvency

The Bankruptcy Code defines "insolvency" as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation. . . ." 11 U.S.C. § 101(32). The UFTA employs an equivalent definition of insolvency. *See* 740 Ill. Comp. Stat. 160/3 ("[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation"). The Seventh Circuit's interpretation of this definition requires courts to determine what a willing buyer would pay for the debtor's entire package of assets and liabilities. *Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d 657, 660 (7th Cir. 1992). If the price is positive, the debtor is solvent; if the price is negative, the debtor is insolvent. *Id.* A plaintiff may offer appropriate proof of insolvency, including balance sheets, financial statements, appraisals, expert reports, and other affirmative evidence. *Schlossberg*, 388 B.R. at 833. In particular, whenever possible, a determination of insolvency should be based on seasonable (i.e. recent) appraisals or expert testimony. *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 37 (2d Cir.1996).

#### 2. EAR's Insolvency

At trial, the Plaintiff testified that he would characterize EAR as a Ponzi scheme. Companies run as Ponzi schemes are presumed insolvent as a matter of law.[1]  However, the

---

[1] "There is little debate that a company run as a Ponzi scheme is insolvent as a matter of law." *Kapila v. Phillips Buick-Pontiac-GMC Truck, Inc. (In re ATM Fin. Servs., LLC)*, Bankr. No. 6:08-bk-969-KSJ, Adv. No. 6:10-ap-44, 2011 WL 2580763, at *6 (Bankr. M.D. Fla. June 24, 2011); *see also Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (stating that "a Ponzi scheme . . . is, as a matter of law, insolvent from its inception"); *Orlick v. Kozyak (In re*

Plaintiff elected not to pursue the Ponzi scheme theory or invoke the presumption of insolvency in this adversary proceeding.[2] Instead, he relied on a three-part argument to prove that EAR was insolvent during the entire four-year look-back period of 2005 through 2008.

First, the Plaintiff's expert witness examined EAR's audited financial statements for the look-back years in question and adjusted certain aspects of those financial statements to reflect EAR's actual business practices, rather than those it publicly professed. Applying those adjustments, the expert concluded that EAR's liabilities far exceeded its assets during the relevant time period.

Second, the Plaintiff provided evidence that EAR vastly overstated its assets by purporting to sell the same few pieces of equipment to multiple financial institution purchasers.

Finally, the Plaintiff introduced evidence that, when EAR's actual assets were finally sold at auction, their sale price was only $6.9 million, compared to their net book value of over $130 million.

---

*Fin. Fed. Title & Trust, Inc.)*, 309 F.3d 1325, 1332 (11th Cir. 2002) (stating that "[b]y definition, a Ponzi scheme is driven further into insolvency with each transaction"); *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995) (finding that because "defrauded investors . . . are tort creditors," corporations run as a Ponzi scheme "were insolvent from the outset and could have been petitioned into bankruptcy"); *Daley v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480, 486 n.17 (D. Conn. 2002) (observing that "a number of courts have held that an enterprise engaged in a Ponzi scheme is insolvent from its inception and becomes increasingly insolvent as the scheme progresses").

[2] The Plaintiff may have made that decision to avoid an argument that it is the "law of the case" in this proceeding that EAR was not run either as a Ponzi scheme or even as a "Ponzi-like" scheme. *See Brandt v. KLC Fin., Inc. (In re Equip. Acquisition Res., Inc.)*, 481 B.R. 422, 432 (Bankr. N.D. Ill. 2012) (Barnes, J.) (granting defendant's motion to dismiss this same Plaintiff's adversary proceeding without prejudice on the ground that the Plaintiff had "failed to allege sufficient facts to establish even a 'Ponzi-like' or similar fraudulent scheme with the required particularity. The Complaint makes general and conclusory statements as to the alleged fraudulent scheme, but fails to give any details as to the scheme itself.") Although the Court need not address this argument in this matter, the Court notes that there are at least two reasons to conclude that Judge Barnes' comments do not foreclose the Plaintiff from arguing in the future that EAR was run as a Ponzi scheme: First, the adversary proceeding before Judge Barnes was an "actual intent" fraudulent conveyance claim, and the Plaintiff was seeking to apply not a presumption of insolvency, but a presumption that EAR's intent must have been actually fraudulent if it was running a Ponzi scheme or a "Ponzi-like" scheme. Second, Judge Barnes' ruling was a dismissal without prejudice, and he permitted the Plaintiff to replead that complaint, leaving open the possibility that the Plaintiff would be able to establish facts sufficient to show that EAR was run as a Ponzi scheme.

The Plaintiff put on his case through two witnesses: himself and Patrick O'Malley, an employee of the Plaintiff's company, Development Specialists, Inc. ("DSI"). Mr. O'Malley testified as both a fact witness and an expert witness. Rohr-Alpha elected not to call any witnesses, relying entirely on its cross-examination of the Plaintiff's two witnesses.

### a. *The Plaintiff's Investigation of EAR's Business*

The Plaintiff and his company provide extensive corporate restructuring services, including financial analysis and advice, to financially ailing companies and their lenders worldwide. In addition, the Plaintiff is frequently asked to step in and manage troubled companies while they work their way through the restructuring process, whether that restructuring occurs inside or outside of bankruptcy. Both the Plaintiff and Mr. O'Malley have extensive experience in analyzing the reasons for a company's financial collapse, and they are experienced in uncovering fraud by a company, its officers, or directors.

In September 2009, a number of creditors of EAR arranged a meeting with EAR's senior management for the purpose of discussing the company's past practices and its future. The discussion concerned EAR's progress toward a restructuring. The creditors invited the Plaintiff to attend the meeting.

The Plaintiff testified that, at the meeting, he was informed that EAR's revenue stream came from two sources: (1) the manufacture and sale of semiconductor chips and (2) the acquisition, sale, refurbishment and lease-back of the machines that manufacture those chips. Management also represented to him that the majority of EAR's revenue stream came from the equipment refurbishment side of its business rather than from semiconductor chip sales.

The Plaintiff testified that EAR's management offered the following explanation of how EAR ran its equipment refurbishment program to provide such significant revenues for the

company:

1. First, EAR would purchase used equipment that was at the end of its useful life and therefore could be bought inexpensively;

2. EAR would then purportedly refurbish the equipment and sell it at a price significantly higher than its original purchase price to its wholly-owned company, Machine Tools Direct, Inc. ("MTD");

3. MTD would next sell the equipment to a third-party equipment lessor;

4. Almost simultaneously with step three, EAR would enter into a long-term lease of the supposedly refurbished equipment from the third-party equipment lessor; and

5. Finally, EAR would use the proceeds from its sale of semiconductor chips to make the monthly equipment lease payments.

In an effort to verify management's official explanation of its business model, the Plaintiff asked to see the refurbished equipment. He testified that EAR's key officers initially avoided showing him EAR's equipment and inventory. When he was finally allowed access to the supposedly refurbished equipment, he found that most of it was in complete disrepair, that very few machines were even operable, and that the equipment in EAR's warehouses did not match what was stated on EAR's books. The Plaintiff also described finding boxes of removable magnetic strips containing serial numbers for EAR's equipment. Because serial numbers are normally permanently affixed to large pieces of equipment, the fact that EAR was using removable magnetic strips to identify equipment increased the Plaintiff's suspicion that EAR was doing something improper with its equipment refurbishing and sale/leaseback program.[3]

### b. Mr. O'Malley's Expert Opinion as to EAR's Insolvency

As an expert witness for the Plaintiff regarding the insolvency of EAR, Mr. O'Malley testified that EAR was insolvent during each of the four look-back years of 2005 through 2008.

---

[3] The Plaintiff testified that in the course of his investigation, he reviewed EAR's financial documents. Almost all of those documents as well as the magnetic serial plates were confiscated by the Federal Bureau of Investigation.

Mr. O'Malley is a senior consultant and the chief financial officer of DSI. He is a licensed certified public accountant and has previously acted as a chief financial officer, financial advisor, Chapter 11 trustee, responsible party, and examiner in various bankruptcy cases. He has also previously testified as an expert witness in many bankruptcy cases, including three occasions on which he offered expert testimony regarding a debtor's solvency.[4] In this matter, Mr. O'Malley was asked to prepare an expert report and testify regarding whether EAR "was solvent or insolvent as of the dates of certain transfers that span the four years prior to its bankruptcy filing on October 23, 2009." (Pl. Ex. No. 5, Expert Report of Patrick J. O'Malley at p. 1 (the "Expert Report").)

In preparing his Expert Report, Mr. O'Malley personally reviewed many of the books and records of EAR and, under his supervision and control, his staff reviewed those documents that he did not personally review. These documents included: (1) EAR's various operating and equipment leases for the four-year look-back period; (2) EAR's corporate books and records, including its accounting records; and (3) EAR's financial statements for the years in question.[5]

Based upon his review of these various documents and his personal inspection of the premises where EAR conducted its operations (including an inspection of the equipment located therein), Mr. O'Malley offered the following summary of how EAR actually conducted its business, as compared to its public, sanitized version of how it did so:

---

[4] "I have significant experience in circumstances of fraud and forensics accounting and have testified on solvency on three occasions: Avidus Trading LLC, Computer World Solution, Inc. and Commercial Loan Corporation." (Expert Report at p. 1.)

[5] The audited financial statements were all prepared by an independent accounting firm, Von Lehman & Company ("Von Lehman"). These financial statements were audited by Von Lehman for the years ended December 31, 2008 and 2007 and were merely reviewed by Von Lehman for the years ended December 31, 2006 and 2005. As more extensively discussed in the body of this Opinion, it was Mr. O'Malley's conclusion that none of these financial statements were properly prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). (Expert Report at p. 4.)

"EAR's fraudulent scheme generally involved it purchasing high-tech equipment near the end of its life-cycle at extremely low prices relative to the cost of a new unit. EAR then sold that same piece of equipment to a shill company [MTD] at dramatically more than the price EAR had paid for the piece of equipment." (Expert Report at p. 2.)

MTD would then sell the piece of equipment to the financial institution purchaser for a purchase price elevated by the artificial, high invoice issued by MTD. EAR would then lease the equipment from the financial institution purchaser. Further, EAR commonly sold the same piece of equipment to multiple financial institution purchasers, and thus pledged a piece of equipment to multiple financial institution purchasers. In some instances the pieces of equipment that were the subject of these transactions were entirely fictitious. (*Id.*)

"EAR received the proceeds from the lenders' purchase of the equipment--less a cut for MTD and used the proceeds to pay EAR's lease obligations, purchase non-business related assets, fund distributions to shareholders, and, inter alia, make direct payments to casinos for gaming activities by the principals of the company and others." (*Id.* at p. 3.)

"Hard evidence of the fraud goes back to 2003, and it likely began earlier than that. For the period from 2005 through the date of the bankruptcy filing in late 2009, there appears to be a limited amount of legitimate business activity." (*Id.* at pp. 2-3.)

Next, Mr. O'Malley testified that, in preparing his report, he reviewed various documents, including: (1) EAR's financial reports from 2005, 2006, 2007, and 2008, which were prepared by Von Lehman; (2) an asset inventory list compiled in 2009; (3) the sales report from EAR's asset sale; (4) EAR's invoices, ledgers, and leases; and (5) MTD's invoices and purchase orders.[6]

Mr. O'Malley accepted at face value Von Lehman's valuation of the following EAR assets during the four years in question: (1) cash; (2) accounts receivable from all entities *except for MTD*; (3) prepaid expenses; (4) property and equipment (excluding equipment under capital lease); (5) deposits on leased equipment; (6) "other deposits;" and (7) notes receivable from non-insiders. (*Id.* at p. 4.)

---

[6] A complete list of the documents reviewed by Mr. O'Malley and his staff was attached as Exhibit No. 3 to his Expert Report.

Mr. O'Malley testified that Von Lehman's audited or reviewed evaluation of certain of EAR's assets and liabilities should be adjusted downward to reflect the consequences of EAR's fraud. Mr. O'Malley made the following downward adjustments to Von Lehman's remaining asset valuations:

- He valued accounts receivable from MTD at zero: "Transactions with MTD were generally fraudulent and any cash received from MTD was the direct result of EAR entering into an additional fraudulently induced lease with a financial institution. All accounts receivable due from MTD were valued at zero as accounts receivable from MTD would not have any value absent EAR entering into another fraudulent transaction." (*Id.*)

- He valued an "engineering technology" asset at zero because Von Lehman had done so previously and because there was no documentation to support even the existence of this asset: "EAR recorded an asset at December 31, 2006 in the amount of $908,267. This balance was written off by the auditors in 2007 'because there was no verifiable documentation to support their existence.' The Engineering Technology balance was valued at zero as there was no support that it represented an asset." (*Id.*)

- He valued "notes receivable" from insiders at zero: "EAR recorded $10,350,000 note receivable from officers of [EAR] in 2008 that was valued at zero due to lack of ability to repay this note." (*Id.*)

- With respect to the value of inventory and equipment under capital lease, Mr. O'Malley made three fundamental points:

  > First, because EAR never really ran a legitimate semiconductor-chip manufacturing plant to begin with, it did not need much equipment, and its book listing of the value of its equipment was therefore too large to be credible: "The equipment acquired by EAR pursuant to capital leases was allegedly used in the operation of its purported processing business. EAR's processing business was very limited, if it existed at all. The leased equipment was the exact same equipment that the company supposedly refurbished as part of its equipment resale business." (*Id.* at p. 7.)

  > Second, when an actual physical equipment audit was performed in 2009 (something that Von Lehman failed to do during any of the years in which it reviewed or audited EAR's financial statements), the audited numbers were far lower than the book numbers: "A physical count of equipment performed in late 2009 demonstrated that EAR possessed less than half of the pieces of equipment reflected in the financial statements. This is consistent with EAR's practice of changing serial numbers of pieces of equipment to facilitate leasing one piece of equipment from multiple financial institutions." (*Id.*)

Third, the significant overstatement of EAR's equipment value in its books and records was further confirmed when the equipment was finally auctioned off: "EAR abandoned its inventory and equipment to its lenders in late 2009. At the time of the abandonment, the inventory and equipment had a net book value of over $130 million. In February 2011, an auction of EAR's inventory and equipment was conducted and the sales reconciliation report shows that the gross proceeds were approximately $6.9 million, or a little more than 5% of the net book value. The auction proceeds received (representing just a small fraction of the net book value) is consistent with the nature of the fraud whereby a shill was used to fraudulently induce financial institutions to enter into equipment leases at huge multiples to actual value or where the underlying equipment did not even exist." (*Id.* at p. 8.)

Mr. O'Malley accepted at face value the valuations placed by Von Lehman upon the following EAR liabilities during the four years in question: (1) line of credit; (2) installment notes payable; (3) accounts payable; (4) customer deposits; (5) accrued expenses; (6) capital lease obligations; (7) notes payable to stockholder; and (8) fair market value of interest rate swap. (*Id.* at pp. 5-6.) Mr. O'Malley made the following *downward* adjustments to certain liabilities: (1) for purposes of "determining EAR's debts [under its operating lease obligations], the remaining lease payments have been discounted at a 6.3% to 8.0% [discount rate], based upon an average of financing leases incurred each year, to determine the present value of the obligations" (*id.* at p. 5); (2) income taxes payable have been reduced to zero: "If the historical financial statements of EAR are restated to exclude the fraudulent sales transactions, there is no taxable income and no taxes payable" (*id.* at p. 6); and (3) deferred income tax liability has been reduced to zero for the same reason. (*Id.*)

Based upon this analysis, Mr. O'Malley prepared restated financial statements for EAR for the years in question, which are attached as Group Exhibit No. 2 to his Expert Report. Those restated financial statements reflect his opinion "that the sum of EAR's debt exceeded its assets at a fair valuation on December 31, 2005 [by $31,057,109]; on December 31, 2006 [by

$46,939,303]; on December 31, 2007 [by $65,073,625] and on December 31, 2008 [by $116,090,271]." (*Id.* at p. 8 and Group Exhibit No. 2.)

He also concluded that "EAR would not have been able to continue in business in 2005 through 2009 without new funds generated from additional fraudulent lease transactions. Accordingly EAR was not able to pay its debts as they become due in the normal course of business in 2005 through 2009." (*Id.* at p. 8.) Finally, he concluded that "EAR was insolvent beginning at least at December 31, 2005 and for all periods thereafter under the definitions of the Bankruptcy Code and the Illinois [UFTA]." (*Id.*)

Mr. O'Malley's testimony and his Expert Report were the only evidence provided by either party regarding EAR's insolvency.

### c. *Rohr-Alpha's Challenge of Mr. O'Malley's Expert Opinion*

Rohr-Alpha argues that even though it presented no documentary evidence or testimony of its own to refute Mr. O'Malley's testimony and Expert Report, the Court should reject his findings and conclusions because his analysis is flawed. Specifically, Rohr-Alpha contends that the Expert Report should be disregarded because there is no way to value EAR's assets as of 2007 – the year in which the alleged fraudulent transfers occurred.

The trier of fact is free to determine what weight to afford an expert's opinion. *Baldi v. Samuel Son & Co. (In re McCook Metals, L.L.C.)*, No. 05 C 2990, 2007 WL 4287507, at *8 (N.D. Ill. Dec. 4, 2007), *aff'd*, 548 F.3d 579 (7th Cir. 2008). "Though an expert's opinion may be admissible, the admissibility of the expert's opinion does not equate with its utility in satisfying a burden of proof. . . . The fact finder must still consider the credibility of the expert and determine the weight to be accorded to his or her testimony and report." *Fisher v. Sellas (In re Lake States Commodities, Inc.)*, 272 B.R. 233, 243 (Bankr. N.D. Ill. 2002), *aff'd sub nom.*

*Fisher v. Page*, No. 02 C 1588, 2002 WL 31749262 (N.D. Ill. Dec. 3, 2002); *see also McCook Metals*, 2007 WL 4287507, at *8.

Rohr-Alpha argues that, like the expert opinions in *Lake States Commodities* and *McCook Metals*, Mr. O'Malley's opinion is flawed and should carry no weight in determining solvency. The Court disagrees. This case differs fundamentally from the situations presented in *Lake States Commodities* and *McCook Metals* in ways that render those decisions unhelpful to Rohr-Alpha.

In the *Lake States Commodities* case, the court gave no weight to the expert's opinion because his report was based on insufficient validation of the underlying sources and lacked meaningful testing of the information upon which the report was based. 272 B.R. at 244-45. By contrast, Mr. O'Malley reviewed and analyzed EAR's books and records; personally observed EAR's premises and the contents thereof; and interviewed EAR's president, Mark Anstett, and Sheldon Player, one of the company's officers. Mr. O'Malley's Expert Report was also based upon his and the Plaintiff's discovery of physical evidence substantiating the existence and nature of EAR's fraudulent scheme: a box full of magnetic serial numbers used by EAR to misidentify equipment so it could be sold to and leased back from multiple financial institutions. In addition, Mr. O'Malley was able to rely upon the report from the sale of EAR's equipment demonstrating the gross disparity between EAR's book-valuation of its equipment and its proven worth at auction. Finally, unlike the report of the expert in *Lake States Commodities*, Mr. O'Malley's Expert Report does not rely on second-hand information for data and analysis. Mr. O'Malley conducted his investigation and reached his conclusions personally or with the assistance of his staff. He offered comprehensive and credible testimony regarding the methodologies and procedures that he employed, as well as his reasoning for doing so.

Furthermore, he provided the Court with all of his calculations, so that the Court could determine independently whether his methodology and conclusions were sound. These factors combine to make Mr. O'Malley's Expert Report far more credible than the report rejected in *Lake States Commodities*.

In *McCook Metals*, the district court affirmed the bankruptcy court's decision to reject the expert's opinion. In that case, the bankruptcy court was presented with alternative evidence that was more credible than the evidence that the expert relied upon, and thus the court rejected the expert's conclusion in favor of the other evidence.[7] 2007 WL 4287507, at *6-9. In addition, the bankruptcy court found that the expert's report was fundamentally flawed in its calculation of liabilities because he failed to properly discount contingent liabilities. *Id.* at *10-11.

By contrast, in this case, no alternative insolvency evidence was presented for the Court's consideration. Rohr-Alpha argues that the Court should simply accept the Von Lehman audited and reviewed financial statements for 2005 through 2008 at face value. But no party ever moved those financial statements into evidence or offered the testimony of the Von Lehman personnel responsible for preparing those statements. It is not possible at this late date for the Court to consider those statements directly. Moreover, Von Lehman's statements for two of the years in question (2006 and 2005) were not even audited, but were merely reviewed.[8] In addition, the Court finds that Mr. O'Malley's criticisms of the Von Lehman statements are valid and leave the Court with the firm impression that Von Lehman was either unaware of EAR's fraud or failed to

---

[7] Specifically, the calculations used in the expert's report projected energy costs for running the debtor's smelting plant. The court was able to compare the evidence supplied by the trustee's expert against the evidence provided by the debtor's managers and found the latter to be more reliable. *McCook Metals*, 2007 WL 4287507, at *9.

[8] Mr. O'Malley testified that an audit includes verification of accounts receivable and physical observation of inventory. A review, on the other hand, according to Mr. O'Malley is limited to an analytical analysis of the financial statements and inquires of management regarding how they kept the books and records and how the business operated. Thus, this Court affords less weight to EAR's reviewed financial statements as opposed to its audited financial statements.

consider it in its review or audit of the financial statements.

Finally, Rohr-Alpha argues that Mr. O'Malley's opinion should be rejected because it rests on faulty analysis with respect to his rejection of Von Lehman's asset analysis and decision to adjust all MTD-related assets to zero, despite Mr. O'Malley's admission that those assets had some value, even if only as scrap. Rohr-Alpha contends that this alleged flaw in Mr. O'Malley's analysis requires the Court to reject it in its entirety.

This criticism entirely misses the point of Mr. O'Malley's testimony. By definition, the scrap value of equipment can normally be expected to be far less than its operational value. But as Mr. O'Malley also testified, in order to lift EAR into the zone of solvency, the scrap value of its equipment would have had to have been unrealistically large: $30 million in 2005; $45 million in 2006; $65 million in 2007; and $115 million in 2008.[9] The Court does not have to engage in guesswork to know that these inflated values are unrealistic because this exact same equipment actually sold for $6.9 million when it was finally auctioned off in 2011. Rohr-Alpha asks the Court to throw out Mr. O'Malley's entire insolvency analysis because he did not arrive at a precise scrap value of the EAR equipment for 2007. But he certainly established that, whatever the equipment's scrap value was in 2007, it could not possibly have been large enough to bring EAR within the zone of solvency. Because Rohr-Alpha has failed to offer any plausible basis for rejecting that opinion, the Court rejects Rohr-Alpha's criticism and request.

### d. Weight Afforded to Mr. O'Malley's Expert Opinion

The Court affords great weight to both Mr. O'Malley's Expert Report and his testimony for the following reasons. First, Mr. O'Malley's testimony was credible and uncontroverted. Second, his Expert Report contains sufficient foundations for his opinion and ultimate

---

[9] These numbers are the amounts by which Mr. O'Malley concluded EAR's debts exceeded its assets during the four-year look-back period (*See* Expert Report at p. 6.)

conclusion that EAR was insolvent. Third, Mr. O'Malley's testimony provided an adequate explanation of the bases for his insolvency analysis. The Court therefore finds Mr. O'Malley's Expert Report and testimony both credible and reliable with respect to the issue of EAR's insolvency during the years of 2005-2008.

Rohr-Alpha had every opportunity to present its own expert or testimony but chose not to do so. While the burden is clearly on the Plaintiff to establish EAR's insolvency and Rohr-Alpha has no obligation to prove the contrary, Rohr-Alpha's arguments fail to invalidate or controvert Mr. O'Malley's expert opinion that EAR was deeply insolvent during the relevant four-year period. Therefore, the Court finds that EAR was insolvent from 2005-2008, the four-year look-back period.

## B. The Transfer-of-the-Debtor's-Property Element

Rohr-Alpha disputes the next element of a fraudulent conveyance claim: that EAR transferred its property or interest therein. The Plaintiff alleges that insiders of EAR purchased two vehicles using EAR's funds in 2007. One was a 2007 Jeep Liberty (the "2007 Jeep") purchased via three checks written in July 2007 to Rohr-Alpha. The second vehicle was a 2006 Jeep Liberty (the "2006 Jeep") purchased via a single check written in December 2007 to Rohr-Alpha. The Plaintiff seeks to avoid these four transfers and recover them from Rohr-Alpha. The transfers are evidenced by the following checks:

- Check No. 1235 dated July 11, 2007 in the amount of $17,000 from a Jackson State Bank & Trust account. (Pl. Ex. No. 2.)

- Check No. 1779 dated July 11, 2007 in the amount of $5,013.66 from a Charter One bank account. (Pl. Ex. No. 3.)

- Check No. 1811 dated July 12, 2007 in the amount of $1,000 from a Charter One bank account. (Pl. Ex. No. 4.)

- Check No. 1236 dated December 18, 2007 in the amount of $18,550.45 from a Jackson State Bank & Trust account. (Pl. Ex. No. 1.)

Rohr-Alpha argues that the Plaintiff cannot prove that the funds used to purchase the two vehicles belonged to EAR. Specifically, Rohr-Alpha argues that the Charter One account, which was used in part to purchase the 2007 Jeep, contained mostly private funds belonging to Donna Malone, who was the wife of Sheldon Player.[10] The evidence at trial shows otherwise.

First, the Jackson State Bank & Trust account is titled in the name of "Equipment Acquisition Resources, Inc." (Pl. Ex. Nos. 1 & 2.) The Plaintiff testified that EAR had an account at Jackson State Bank & Trust in Wyoming ending in #5419, which is the account number that appears on the two checks that were used in part to purchase both vehicles. (*Id.*) The Plaintiff testified that this Jackson State Bank account was one of the two primary EAR bank accounts. The Plaintiff testified that the funds in the Jackson State Bank & Trust account were EAR's funds.

Next, the Charter One bank account, against which the remaining two checks were drawn, is titled in the names of "Donna Malone" and "E.A.R." (Pl. Ex. Nos. 3 & 4.) The Plaintiff testified that this account was used by EAR as a business account. The Plaintiff further stated that he reviewed the deposits made into this account and concluded that Donna Malone did not deposit any personal funds into this account.

Furthermore, there is no contrary evidence before the Court to indicate that the funds used to purchase the 2006 and 2007 Jeeps were anything other than EAR's funds.

Therefore, the Court finds that the Plaintiff has demonstrated that EAR's funds were transferred to Rohr-Alpha for the purchase of the two vehicles. The Plaintiff has met his burden of showing that the transfers were property of EAR.

---

[10] Donna Malone also appears to have been both an officer and board member of EAR. *See* n.12 *infra.*

## C. The Reasonably-Equivalent-Value Element

Finally, Rohr-Alpha disputes the assertion that EAR did not receive reasonably equivalent value for the transfer of its funds. It is undisputed that the two vehicles were worth approximately the amount of the transfers that the Plaintiff seeks to recover – $41,564.11. Rohr-Alpha contends that EAR received the two vehicles in exchange for the transfer of its funds.

### 1. Legal Standards for Determining Reasonably Equivalent Value

The Bankruptcy Code does not define the term "reasonably equivalent value." The Seventh Circuit, however, has stated that the test for "reasonably equivalent value" requires courts to determine the value of what was transferred and compare that to the value the debtor received. *Creditor's Comm. of Jumer's Castle Lodge, Inc. v. Jumer*, 472 F.3d 943, 947 (7th Cir. 2007); *Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997). The determination of what constitutes "reasonably equivalent value" does not involve application of a fixed mathematical formula. *Barber*, 129 F.3d at 387. Because value need only be reasonably equivalent, a "debtor need not collect a dollar-for-dollar equivalent to receive reasonably equivalent value." *Id.*

Determination of "reasonably equivalent value" is a two-step process. *Anand v. Nat'l Republic Bank of Chi.*, 239 B.R. 511, 516–17 (N.D. Ill. 1999). A court must first determine whether the debtor received value, and then examine whether the value is reasonably equivalent to what the debtor gave up. *Id.* at 517. "Equivalent value must be measured as of the time of the transfer." *Baldi v. Lynch (In re McCook Metals, L.L.C.)*, 319 B.R. 570, 589 (Bankr. N.D. Ill. 2005).

Whether "reasonably equivalent value" has been given is a question of fact that depends on the circumstances surrounding the transaction. *Barber*, 129 F.3d at 387. Among the factors

utilized by courts in making this determination include: (1) whether the value of what was transferred is equal to the value of what was received; (2) the fair market value of what was transferred and received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee. *Id.*

### 2. The Purchase of the 2007 Jeep

The Court must determine whether EAR received any value for the transfer of its funds for the purchase of the 2007 Jeep, and, if so, whether the value received was comparable to what was transferred. Rohr-Alpha contends that in exchange for $23,013.66, it provided the 2007 Jeep.

The Plaintiff contends that this vehicle was actually purchased for Shirley M. Drucker, Donna Malone's mother. First, the sales contract for the 2007 Jeep identifies Shirley M. Drucker of 1337 E. Evergreen, Palatine, IL 60067, as the purchaser. (Pl. Ex. No. 10). Second, the new vehicle delivery check sheet also lists Shirley M. Drucker as the purchaser of the 2007 Jeep. (Pl. Ex. No. 13). Both documents were signed by Shirley M. Drucker. In addition, one of the checks written to Rohr-Alpha for the purchase of the 2007 Jeep contains the following reference in the memo line: "Shirley Drucker 2007 Jeep." (Pl. Ex. No. 4.)

There was no evidence adduced at trial to show that the payments made to Rohr-Alpha benefitted EAR, rather than Shirley M. Drucker. Because both the sales contract and the new vehicle delivery check sheet indicate that the owner of the 2007 Jeep vehicle was Shirley M. Drucker, the vehicle was presumably purchased for her personal use. (*See* Pl. Ex. Nos. 10 & 13.) The Plaintiff testified that Shirley M. Drucker was not an employee of EAR nor did she have any role in EAR's business. Ms. Drucker's only connection to EAR appears to be as Donna

Malone's mother.  Further, there was no evidence that EAR ever had possession or use of the
2007 Jeep.

Therefore, the Court finds that the cash that EAR transferred – $23,013.66 – was not
reasonably equivalent to what it received – nothing.  The transfer was made within the four-year
look-back period under the UFTA – the checks were written in July 2007, which is within the
four-year period prior to EAR's bankruptcy filing in October 2009.  The Court has already
determined that EAR was insolvent during the relevant look-back period and that the transfer
was of property of EAR.

The Court therefore finds that the $23,013.66 transferred by EAR to Rohr-Alpha for the
2007 Jeep is constructively fraudulent under § 5 of the UFTA and is therefore avoidable and
recoverable by the Plaintiff.

### 3. The Purchase of the 2006 Jeep

The Court must determine whether EAR received any value for the transfer of its funds in
December 2007 for the purchase of the 2006 Jeep, and, if so, whether the value received was
comparable to what was transferred.  Rohr-Alpha contends that in exchange for the receipt of
$18,550.45, it provided the 2006 Jeep to EAR.  The Plaintiff, to the contrary, argues that EAR
was not the recipient of this vehicle, and that it was actually purchased for Richard Drucker,
Donna Malone's father.

The Plaintiff testified that Richard Drucker was not an employee of EAR and that he did
not play a role in EAR's business.  The sales contract for the 2006 Jeep listed both EAR, Inc. and
Donna Malone as the purchasers, and included EAR's corporate address (555 South Vermont St.,
Palatine, IL 60067) as the owners' address.  (Pl. Ex. No. 22).  This contract was signed by Donna
Malone.  *Id.*  While the original certificate of title for the 2006 Jeep was not admitted into

evidence, the Plaintiff testified that it was originally issued jointly to EAR and Donna Malone on January 14, 2008. Thereafter, on January 24, 2008, a request to correct title was made. [11] (Pl. Ex. No. 20.) On February 13, 2008, approximately two months after the sale date, a new title to the 2006 Jeep was issued to Richard Drucker at 454 N. Aberdeen St. 2S, Chicago, IL 60622. (Pl. Ex. No. 21.)

The Plaintiff argues that, notwithstanding this two-month delay in transferring title to Richard Drucker, he believed that Mr. Drucker actually took possession of the 2006 Jeep immediately after the December 2007 sale date and thereby deprived EAR of any value from the purchase of the vehicle. The Plaintiff therefore concluded that the Jeep never came into EAR's possession or became its property.

It is settled doctrine that in order to determine reasonably equivalent value, the Court must look at the exchange that occurred as of the time the transfer took place. *See McCook Metals*, 319 B.R. at 589 (stating that "[e]quivalent value *must* be measured as of the *time of the transfer*") (emphasis added). Thus, the Court will only consider the circumstances that applied on December 18, 2007, to determine whether there was reasonably equivalent value given for the transfer.

Here, the documents evidencing the sale of the 2006 Jeep show that EAR was an owner of this vehicle. The sales contract clearly indicates that EAR and Donna Malone were the purchasers, and the address listed on the document is EAR's corporate address in Palatine, Illinois. (Pl. Ex. No. 22.) The title to the vehicle also listed both EAR and Donna Malone as the owners.

The Plaintiff testified that Donna Malone, in some cases, was the responsible corporate

---

[11] It is unclear who made the request to correct title to the 2006 Jeep. This document, which was submitted into evidence by the Plaintiff, contains a redaction in the signature block.

officer or person who signed many of the documents, including leases and articles of incorporation, on EAR's behalf. While it may not be entirely clear from the record what exact role Donna Malone played in EAR's management, the Court concludes and finds that the record is sufficient to establish that she acted on behalf of EAR in some capacity with respect to the transaction at issue.[12]

Thus, the sales contract and the title to the 2006 Jeep show that EAR was the initial owner or co-owner of the vehicle. As stated above, the subsequent change in title to reflect Richard Drucker as the owner has no bearing on whether EAR received reasonably equivalent value at the time of the transfer in December 2007. As a result, the Court finds that, at least as of the time of the December 2007 transfer, EAR received a 2006 Jeep in exchange for the transfer. Moreover, because both parties agree that $18,550.45 is the fair value of the 2006 Jeep, the Court concludes that EAR did in fact receive reasonably equivalent value for the transfer.

Because the Plaintiff has failed to satisfy the reasonably equivalent value element of his fraudulent conveyance claim with respect to the 2006 Jeep, the Court finds that this transfer is not avoidable.

## IV. CONCLUSION

For the foregoing reasons, the Court recommends that the District Court grant judgment in favor of Rohr-Alpha on Count I of the complaint. The transfer for the 2006 Jeep is not

---

[12] The Plaintiff attempted to argue that Donna Malone could not have purchased the 2006 Jeep on behalf of EAR because she was never a corporate officer of EAR. At trial, the Plaintiff stated that Donna Malone had previously testified in a different proceeding that she was never the CEO of EAR or otherwise affiliated with its management. However, in his complaint in this case, the Plaintiff himself alleged that Donna Malone was a member of the board of directors and an officer of EAR. (Dkt. No. 1 at ¶ 9.) ("On October 8, 2009, after it became apparent that [EAR] engaged in fraudulent activity, the members of [EAR's] board of directors and its officers, including Donna Malone . . . and Mark Anstett . . . resigned.") Moreover, in a separate adversary proceeding before this Court, the Plaintiff argued that Donna Malone was in fact an officer of EAR, and the Court made such a finding. *Brandt v. Charter Airlines (In re Equip. Acquisition Res., Inc.),* 511 B.R. 527, 530 (Bankr. N.D. Ill. 2014) ("Eschewing commercial flights, *EAR officers* Sheldon Player . . . , Mark Anstett . . . , *and Donna Malone* . . . flew on Charter Airlines private jets . . . .") (emphasis added).

avoidable under § 548(a)(1)(B) as constructively fraudulent because EAR received reasonably equivalent value in exchange for the transfer.

The Court recommends the entry of partial judgment in favor of the Plaintiff and against Rohr-Alpha under Count II of the complaint. Specifically, with respect to the transfers for the 2007 Jeep, the Court concludes that those transfers were constructively fraudulent under § 5 of the UFTA and thus avoidable under § 544(b)(1). Accordingly, under § 550(a)(1), the Plaintiff may recover from Rohr-Alpha the sum of $23,013.66, which constitutes the amount of the transfers for the purchase of the 2007 Jeep.

The above constitutes the Court's proposed findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 9033.

ENTERED:

DATE: _February 7, 2015_

_Donald R. Cassling_
**Donald R. Cassling**
**United States Bankruptcy Judge**